THE DEPARTMENT OF TRANSPORTATION, Plaintiff-Appellant, v. SOO LINE RAILROAD COMPANY *et al.*, Defendants-Appellees.

Fourth District No. 4—90—0844

Opinion filed October 30, 1991.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Jan E. Hughes, Assistant Attorney General, of Chicago, of counsel), for appellant.

Roland W. Burris, Attorney General, of Springfield (Myra L. Karegianes, Special Assistant Attorney General, of Chicago, of counsel), for appellee Illinois Commerce Commission.

Randall V. TeWinkle, of Soo Line Railroad Company, of Chicago, for appellee Soo Line Railroad Company.

JUSTICE GREEN delivered the opinion of the court:

Section 18c—7401(3) of the Illinois Commercial Transportation Law (Transportation Law) (Ill. Rev. Stat. 1989, ch. 95½, par. 18c—7401(3)) forbids construction of a road, highway, or street across the track of any rail carriers without first obtaining approval of the Illinois Commerce Commission (Commission). On May 3, 1988, Illinois Department of Transportation (IDOT) filed a petition with the defendant Commission seeking permission to construct an "at-grade" highway crossing at the intersection of the tracks of defendant Soo Line Railroad Company (Soo Line) and proposed relocated routes U.S. 52 and Illinois 64 west of Lanark in Carroll County. An "at-grade" crossing is one where a railway and a highway intersect at the same elevation. Soo Line was made a respondent to those proceedings. It objected, contending that the IDOT plan failed to preserve and promote the safety and convenience of the public.

After holding hearings, the Commission entered an order on November 8, 1989, approving IDOT's proposal. This proposal was part of a plan to relocate the previously mentioned highways in such a way as to remove dangerous curves. The highways had previously passed underneath the Soo Line tracks at a point some 400 feet away. As a condition of building the new crossing, the Commission ordered that Soo Line remove the existing underpass structure or fill in the underpass and restore the embankment but ordered IDOT to pay for the work. The Commission ordered IDOT to pay for the expense of erecting the crossing but charged the Soo Line with the responsibility of maintaining the crossing and the warning lights and gates which were ordered to be installed. The Commission also required IDOT to erect a median between the two lanes of the highway for a distance of 100 feet on each side of the crossing.

IDOT objected to the requirements that it (1) pay the cost of removing the underpass or filling it and restoring the embankment, and (2) install median strips. IDOT sought reconsideration, which was denied. Acting pursuant to section 18c—2206 of the Transportation Law (Ill. Rev. Stat. 1989, ch. 95½, par. 18c—2206) on February 14, 1990,

IDOT filed a petition for administrative review (Ill. Rev. Stat. 1989, ch. 110, par. 3—104) in the circuit court of Sangamon County. On October 4, 1990, that court affirmed the order of the Commission. IDOT appealed to this court. We hold the Commission order was proper in regard to its provisions concerning the overpass, but the requirement for providing medians was entered without sufficient evidence being offered to enable the Commission to make a considered decision.

■ Similar to other rules in regard to judicial review of administrative decisions, section 18c—2202(1) of the Transportation Law limits the scope of judicial review of Commission decisions under the Transportation Law to determinations of whether:

> "(a) The Commission's order is against the manifest weight of evidence in the record before the Commission;
>
> (b) The order is contrary to provisions of this Chapter or Commission regulations;
>
> (c) The order is an abuse of discretion;
>
> (d) The order is beyond the jurisdiction of the Commission; or
>
> (e) The order denies constitutional rights of the person seeking judicial review." (Ill. Rev. Stat. 1989, ch. 95½, par. 18c—2202(1).)

IDOT contends that the requirements for it to pay for the work in connection with the underpass and for the median were both beyond the power of the Commission and contrary to the manifest weight of the evidence.

■ We examine first the question of the power of the Commission. In setting forth the powers of the Commission when requests are more for the construction of crossings, section 18c—7401(3) of the Transportation Law states:

> "The Commission shall have the right to refuse its permission or to grant it upon such *terms* and *conditions* as it may prescribe. The Commission shall have power to determine and prescribe the manner, including the particular point of crossing, and the terms of installation, operation, maintenance, use and *protection of each such crossing.*" (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 95½, par. 18c—7401(3).)

Section 18c—7401(3) also states:

> "The Commission shall also have power, after a hearing, to *require major alteration of or to abolish* any crossing, heretofore or hereafter established, when in its opinion, the public safety requires such alteration or abolition, and, except in cities, villages and incorporated towns of 1,000,000 or more inhab-

itants, to vacate and close that part of the highway on such crossing altered or abolished and cause barricades to be erected across such highway in such manner as to prevent the use of such crossing as a highway, when, in the opinion of the Commission, the public convenience served by the crossing in question is not such as to justify the further retention thereof *** and to prescribe, after a hearing of the parties *** the proportion in which the *expense* of the *** *abolition* of such crossings *** shall *be divided* between *** such carrier or *carriers* and the *State* *** or other public authority in interest." (Emphasis added.) Ill. Rev. Stat. 1989, ch. 95½, par. 18c—7401(3).

The Commission held its authority to impose the cost of the removal of the underpass upon IDOT arose from the provisions of section 18c—7401(3) authorizing it to proportion costs involved in the abandonment or major alteration of any crossing.

IDOT asserts that any removal or filling of the presently used underpass is not part of the construction of the new crossing nor is it part of a major alteration of the existing crossing within the meaning of section 18c—7401(3) of the Transportation Law. IDOT explains that the underpass is some 400 feet from the new crossing. IDOT points out that it has not petitioned the Commission for authority to abandon the underpass but argues it does not need Commission authority to do so and will do so, without such authority, when the new crossing is in existence. Accordingly, IDOT contends the Commission's power to prorate expenses connected with the abolition of a crossing, as set forth in section 18c—7401(3), is not applicable. Finally, IDOT notes that the Commission found that the railroad bridge over the underpass will remain in use, and that authority granted the Commission in section 18c—7401(7) of the Transportation Law (Ill. Rev. Stat. 1989, ch. 95½, par. 18c—7401(7)) to proportion costs of abandonment of a railroad bridge is inapplicable.

The Soo Line and the Commission request that we interpret the power of the Commission pursuant to section 18c—7401(3) more broadly than IDOT would have us do. We agree. In *City of Chicago v. Illinois Commerce Comm'n* (1980), 79 Ill. 2d 213, 402 N.E.2d 595, the Commission had issued a rule requiring public bodies, at their expense, to place and maintain signs on railroad overpasses at crossings indicating the clearance available for vehicles using the crossing. The City of Chicago brought suit contesting the power of the Commission to enact the rule. The supreme court held that section 58 of the then Public Utilities Act (Ill. Rev. Stat. 1977, ch. 111⅔, par. 62), which contained language similar to the wording of section 18c—7401(3) of

the Transportation Law, implied that the Commission had authority to impose the rule upon the city, because of the power the Commission had to direct reconstruction and alteration of crossings. The court stated that "[i]t is well settled that the Commission's jurisdiction over all phases of grade-crossing regulation is plenary and exclusive." *City of Chicago*, 79 Ill. 2d at 219, 402 N.E.2d at 598.

■ As we have indicated, the evidence showed the changed location of the crossing was part of a plan to straighten the two-lane road which carried the traffic of the two designated routes, eliminating dangerous curves. Another aspect of the plan was to replace a bridge across Straddle Creek at a point approximately one-quarter mile west of the railroad crossing. Because of the intended "plenary" and "exclusive" jurisdiction of the Commission over railroad crossings, we agree with the Commission that the installation of the crossing at grade and at a point approximately 400 feet from the underpass constituted a "major alteration" of the crossing at the underpass within the meaning of section 18c—7401(3). Accordingly, the Commission had the power to proportion the expenses involved in connection with the elimination of the underpass. Even if the installation of the at-grade crossing be deemed a new crossing, the Commission would still have the power to require IDOT to pay for the work at the underpass. Because of the plenary power of the Commission and the proximity between the at-grade crossing and the underpass, we conclude that the obligation to pay for the work at the underpass was one of the "conditions [the Commission] may prescribe," pursuant to section 18c—7401(3) of the Transportation Law for granting permission for the at-grade crossing. Ill. Rev. Stat. 1989, ch. 95½, par. 18c—7401(3).

` ■ In the Commission's order, it did not set forth specific reference to the power to order median strips at the crossing, apparently presuming that its power was clear and obvious. In its brief, it explains that this arises from its plenary power of crossings (*City of Chicago*, 79 Ill. 2d 213, 402 N.E.2d 595) and over the statement in section 18c—7401(3) of its power "to determine *** protection of each such crossing." IDOT maintains that the question of whether medians should be placed at the crossing is a technical aspect of highway design which the Commission should not control. Citing *Department of Public Works & Buildings v. Lewis* (1952), 411 Ill. 242, 103 N.E.2d 595, IDOT maintains it has plenary and exclusive control over such design. However, *Lewis* concerned a dispute between the State and a landowner over the design of a highway and did not speak to the division of authority at a rail crossing. As the proposed medians extended only 100 feet on either side of the crossing, we hold that they were

protective devices at the crossing and a matter upon which Commission authority prevailed.

We now turn to the question of the sufficiency of the evidence to support the determination of the Commission. We deem the decision in regard to the underpass was not contrary to the manifest weight of the evidence, but the decision concerning the medians was made without the presentation of sufficient evidence to make a decision.

The biggest dispute in the evidence concerning the expenses in regard to the underpass arose over whether the underpass could reasonably be left in its present condition. The Soo Line took the position that the new crossing should not be put in because an at-grade crossing is inherently more likely to produce train-car collisions, which are nonexistent when the highway traffic goes under the tracks. Its contract engineer, Leif Thorson, testified the underpass structure was presently in good condition and could be maintained for another 15 years if approximately $20,000 were spent to maintain the pilings, and no present need to replace the structure existed. Some photographs were introduced showing graffiti spray painted on the underpass structure. The Commission and the Soo Line maintain this indicates children play there, and the structure is inherently dangerous.

IDOT's evidence indicated it intended to remove the abandoned portion of the highway and to allow the land to be returned to agricultural use. Larry Reed, an IDOT engineer, testified that because of possible flooding of Straddle Creek, filling the underpass to a height approximately four feet from its present level would be required. He stated no further filling was contemplated and did not believe any such filling was necessary. No evidence as to the cost of filling and restoration of the embankment was presented. Thus, the Commission's decision requiring IDOT to pay for this work was based upon very little evidence.

██ However, the existence of some danger arising from an abandoned railroad underpass is a matter of common knowledge. The Commission noted it would be freestanding in a field. The Commission also expressed fear it would subject the Soo Line to liability. Both were proper matters for consideration. The public interest has long been the predominant factor in making decisions about rail crossings. (*Yowell v. Cleveland, Cincinnati, Chicago & St. Louis Ry. Co.* (1935), 360 Ill. 272, 276, 195 N.E. 667, 669.) The interest of railroads may also be considered. (*Baltimore & Ohio Chicago Terminal R.R. Co. v. Illinois Commerce Comm'n* (1977), 55 Ill. App. 3d 915, 918, 370 N.E.2d 1266, 1268-69.) The decision to require the designated work at

the underpass was neither arbitrary, unreasonable, nor contrary to the manifest weight of the evidence.

The Commission's decision to require IDOT to pay for the work on the underpass met the same standard. The underpass had been constructed in 1927 at State expense, but the railroad using the tracks had paid for the expenses of maintaining it. The Soo Line received no benefit from the crossing change, and replacing a crossing where highway traffic went under the tracks with an at-grade crossing inherently increased exposure of the Soo Line for liability and damage to its train arising from crossing collisions. The Soo Line was also required to incur the expense of maintaining the new crossing and its warning lights and gates.

The issue of whether median strips should be provided on each side of the crossing was one upon which even less evidence was offered. The question arose because, under IDOT plans, the new highway would cross the railroad at a 17° angle which, admittedly for various reasons, was usually too sharp an angle to be recommended even when the crossing was to be protected by flashing lights and gates. Evidence was admitted that, because of the sharp angle, the length of the diagonal of track within the area of the two-lane highway and shoulder of 10 feet each would be 156 to 160 feet.

The question of a possible median was apparently raised for the first time when James A. Phillip, appearing for the Commission, in cross-examining Steve Haring, IDOT utility engineer called by IDOT, asked if, because of the length of track exposed, drivers on the highway could easily get through closed gates and if a median barrier would make doing so more difficult. Haring responded by stating "[i]t may not be as easy for them, yes." On redirect, IDOT's counsel asked Haring if he had "an opinion as to what effect such a median separation would have on traffic safety for a highway of [the type involved]." Haring answered "[m]y opinion would be that this barrier *may* present more of a problem because of highway speeds than possibly somebody running around the gate." (Emphasis added.) Presumably, Haring meant that the median would likely present a possible hazard for vehicles crossing the tracks at normal highway speed when no train was coming, and that hazard might be greater than that of vehicles sneaking through when the gates were closed. In addition, Thorson testified that when the crossing gates are down but there is a wide gap between them, motorists would have a tendency to swerve between them to get across.

Even though the Commission has expertise on matters within its jurisdiction (*Peoples Gas, Light & Coke Co. v. Illinois Commerce*

*Comm'n* (1988), 175 Ill. App. 3d 39, 48, 529 N.E.2d 671, 677), no proper decision as to whether the median strips would increase or decrease safety could be made on that meager evidence.

Accordingly, we reverse the portion of the circuit court's order which approved the part of the Commission's order requiring median strips at the at-grade crossing. We affirm the remainder of the circuit court's order affirming the Commission's order. Pursuant to our power under Supreme Court Rule 366(a)(5) (134 Ill. 2d R. 366(a)(5)) to enter any order the circuit court should have entered, we remand the cause to the Commission as authorized by section 3—111(a)(6) of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 3—111(a)(6)) with directions to hear further evidence in regard to the median strips and to make a decision as to whether they should be required.

Affirmed in part; reversed in part and remanded with directions.

McCULLOUGH and KNECHT, JJ., concur.